H. G. S. KEY *vs.* FRANCIS KNOTT AND WIFE.—*December,* 1837.

It is well settled that, in an action at law upon a single bill, the failure of consideration cannot be inquired into or proved.

Under the act of 1832, ch. 302, the objection that evidence is derived from hearsay, must be taken by exception in the Chancery court, and if not so taken in that court, cannot be made here.

The holder of negotiable paper, whose name is forged in the endorsation of it, does not lose his right to the money secured by it, and no title can be made through the medium of such forgery.

The circumstances stated, which excused a party from the consequence of *laches,* who had received a bank post-note, the endorsement of which had been forged, when seeking re-imbursement from the person of whom he had received it.

The rules in reference to demand and notice, applicable to promissory notes and bills of exchange, do not apply to the post-notes of a bank.

When application is made by a defendant in a court of law to the court of Chancery, for relief against the judgment, upon facts, in relation to which the proof is contradictory, it is in the discretion of the Chancery court to decide the facts, or send an issue to be tried in a court of law.

APPEAL from *Chancery.*

THE appellant, on the 9th August, 1832, filed his bill, alleging that the appellees had obtained a judgment at law against him for $1,100, with interest from 12th December, 1818, until paid; that the debt was contracted with *Mary Knott, dum sola;* that the judgment was founded on a *single bill* of the appellant, given for money borrowed by him of the appellee. The bill also alleged that part of the money so borrowed, was a forged note of the Bank of the United States for $500. The object of the bill was to obtain an injunction and relief, to the extent of the forged note. After the coming in of the answer, and evidence being taken, all which sufficiently appears in the arguments of counsel and opinion of this court, the chancellor, on final hearing, dissolved the injunction and dismissed the bill.

From this decree the complainant prayed an appeal, and the cause was argued on notes, before STEPHEN, ARCHER, and DORSEY, Judges.

By J. Johnson, for the appellant :

In this case a bill was filed by the appellant, on the equity side of St. Mary's county court, against the appellees, on the 9th of August, 1832, to be relieved in part against a judgment which the latter had obtained against him, on the 7th day of the same month and year.

The ground of the relief, as stated in the bill, is, that the single bill upon which the judgment was rendered, was given for money loaned to the appellant by one of the appellees (Mary) before her marriage, on the 12th of December, 1818, and that a part of the money so loaned consisted of a postnote of the Bank of the United States for $500, which has proved of no value to the appellant, from the refusal of the bank to pay the same, of which he gave notice to her.

The appellees answered the bill, insisting that the note was a good one. They subsequently filed another answer, taking other grounds of defence ; but this answer was filed without asking or obtaining the leave of the court. The appellant subsequently filed a second bill, against Francis Knott alone, recapitulating the facts charged in the former one, and praying that Knott might be compelled to testify before certain commissioners, acting under a commission from Philadelphia, where the appellant was then prosecuting a suit against the bank upon the note.

No answer appears to have been filed to this bill, nor further proceedings had under it.

It appears from the evidence taken under the commissions, and from the answers and papers filed in the cause, that such a note as is spoken of in the complainant's bill, did constitute a part of the consideration of the sealed note on which the judgment was rendered.

That the appellant immediately parted with it, and that the persons to whom he passed it presented it for payment to the bank, which was refused. That they thereupon returned it to the appellant, who, on the 18th February, 1819, advised Mrs. Knott of the fact, and claiming to be credited with the amount; at the same time saying, that for her benefit he

would exert himself to have it paid, to which she did not object.

It will further appear, that the note had been stolen from the mail, and that some of the endorsements upon it were forged, which was the reason of the refusal of the bank to pay it. That the appellant caused suit to be instituted against the bank, which was decided against him on the 13th February, 1828; and that during the pendency of this suit Mrs. *Knott*, by her counsel, substantially admitted her interest in the result.

After these proceedings the cases were transmitted to the court of Chancery, there consolidated, and the chancellor, by his decree of the 26th of July, 1836, dismissed the complainant's bill.

From this decree the complainant appealed, and will contend :

1. That the note having come to the hands of the appellee *Mary*, through a forged endorsement, vested no title in her, and could vest none to the appellant to whom she passed it.

2. That the identity of the note is sufficiently established, by the pleadings and proofs.

3. That the appellees had reasonable notice of the dishonour of the note, and acquiesced in the steps which the appellant took to recover its amount; substantially admitting, in fact, that they, and not the appellant, were interested in their success.

4. That as the suit brought by *Key*, in *Philadelphia*, did not terminate until after the judgment obtained against him in *St. Mary's*, he could not have made this defence at law, even if such defence could have availed him there, in the action on his single bill.

The counsel of the appellees have been at some pains to show, that the second answer has been properly introduced in the case, and should be considered by this court in the decision of the present controversy; and for that purpose refer to the every day rule, that, that will be approved when done, which the court, upon application, would have directed to be

done. There can be no doubt of the efficacy of this rule, in cases in which it can properly be made applicable; but the appellees will have made but little progress in the attainment of their object, unless they can satisfy the court that the filing of a new or amended answer *would have been directed* by the court, if an application for that purpose had been made. If the court would not have ordered an amended answer, the argument derived from the rule adverted to, can have no application to the case.

The question then is, would the court have ordered the defendants to file an amended answer, if they had been applied to for that purpose? So far from doing so, they had no right to file such answer, unless the bill *had been amended,* and then the amended answer must be restricted to the *new* matter contained in the amended bill. Such is the express decision of this court in the case of *Thomas vs. the Visiters of Frederick County School,* 7 *Gill and John.* 369. At page 387, the court say, " It is unquestionably true, that whenever a bill is amended by the introduction of a new fact, a defendant has a right to answer such amendment, and is entitled to the benefit of his answer upon the trial of the case; *but it is equally clear, that after an answer has been filed, a defendant has no right to alter or amend it, without the leave of the court first obtained for that purpose.*"

It is manifest, therefore, that the court would *not have ordered* an amended answer to be filed; though upon application, setting forth sufficient grounds, they might have *granted leave* for that purpose.

In the case cited from 7 *Gill and John.* the right to file an amended answer, was not asserted as a privilege of the defendants, demandable *ex debito justitiæ,* but was attempted to be justified on the single ground that the bill had been amended, which it was supposed authorized the defendant to re-model the whole frame of the answer. This court, however, decided otherwise, and confined the defendant in his answer to the new matter contained in the amended bill.

So far from its being true, then, that the court would have

ordered an amended answer to be filed, it is by no means certain, that they would have *permitted* it to be done, if applied to.

In 2 *Mad. Ch. Pr.* 375, it is said, "whether an answer may be amended or not, is very much in the discretion of the court." And at page 376, the rule is said to be, "not to permit an amendment of the answer where there has been a mistake, but that the defendant must move to put in a supplemental answer, and accompany the motion with *an affidavit*, in which he must swear that when he put in the answer, he *did not know* the circumstances upon which he applies, or any other circumstances upon which he ought to have stated the fact otherwise."

In 1 *Dick. Rep.* 234, the court ordered an amended bill to be taken off the file, because it was put in without leave; and this court, in the case of *Thomas vs. the Frederick School*, say, "if this will be done, *a fortiori*, ought an answer, when so amended."

It is supposed, therefore, to be perfectly clear, that the appellees cannot have the benefit of their amended answer, and that the case is to be decided without the slightest reference to its contents.

In considering the remaining questions in the case, it should be constantly borne in mind, that the consideration of the single bill passed by *Key* to *Mrs. Knott*, and upon which the judgment was obtained, has failed to the extent of the $500, the amount of the post-note.

If, therefore, he is made to pay the whole amount of the judgment, he will unquestionably be a loser by that sum.

It is not deemed necessary to go into a critical examination of the pleadings and proofs in the case, to show that the post-note in question was passed by *Mrs. Knott* to *Key*, and that it came to the hands of the former through a forged endorsement. The appellees admit in their answer, that *Key* did receive from *Mrs. Knott* a note for $500, though they did not recollect whether it was a post-note or a bank note.

The coincidence of the amounts is a circumstance from

which the identity may be inferred; but it is submitted, that this is sufficiently established by the letter of *Key* to her, of the 18th February, 1819, written but two months and six days after the loan, which it appears by the answers was received by her, and which therefore, must have been filed in the cause by the appellees.

In this letter, he distinctly informed her, that he had taken from her such a note; of the steps he had pursued, and contemplated, for the recovery of the money; of the motives which induced him then not to return it to her; and further, that he should from that time, regard himself as acting in the matter, as her agent; advising her to consider from whom she had received it, in order that she might not be without remedy, in case his efforts should be unsuccessful.

This letter we have seen was received by *Mrs. Knott*, and it is insisted with confidence, precludes her *now* from denying, either that she did pass the note in question to *Key*; or that she was not *then* willing to credit him with its amount if the *Bank* should ultimately refuse to pay it; or, that she did not acquiesce in the steps which he proposed adopting to compel the bank to do so. If she did not mean to concur in the view of the transaction presented by this letter, it was her duty at once to have said so, in order that *Key* might, if he thought proper, contest with *Armstrong* the question of loss, as between themselves.

If all the facts contained in this letter had been asserted by *Key* in the presence of *Mrs. Knott*, without denial on her part, it would have been equivalent to her expressed assent, to their truth, and in that case, she would not now be allowed to controvert them; and it is respectfully insisted, that her receipt of the letter, and omission to deny any of its statements, is the same in legal effect as her silence would have been in the case supposed. Again, the letter from *Blackstone*, the attorney of *Mrs. Knott*, to *Broome*, of the 6th May, 1823, which was *after* the judgment against *Key*, shows clearly, that even up *to that time*, the appellees regarded the suit depending in *Philadelphia* upon the post note, as in

effect for their benefit.   If not, why was that letter written? The argument that it is not evidence, is answered by the remark, that there is no exception, either to the competency of witnesses, the admissibility of evidence, or to the sufficiency of the averments of the bill, as required by the act of assembly. If such exception had been filed, his authority to write the letter, as well as his hand-writing, might have been proved.

But it is said, there is no evidence that the note came to the hands of *Mrs. Knott* through a forged endorsement. Upon this subject, the deposition of *Broome* is supposed to be conclusive, at least in the absence of exceptions to its admissibility.   He states, that he was so informed by the officers of the bank, and that under that conviction they had paid the money to the person whose property it was at the time it was stolen from the mail.

The appellees' counsel say, that no notice of the dishonor of the note could have made them liable for its amount, because it had been regularly endorsed, and transferred to *Key* by delivery merely, and not having been passed for a pre-existing debt, is to be regarded as a sale, in which the purchaser takes the property at his own risk.   This with submission is not the question under discussion.

The question is not whether *Key* could have made *Mrs. Knott* responsible for this note, treating her as an endorser, her name not being upon the instrument; but whether she shall be allowed to recover from him, the whole amount of an obligation given by him to her, when there has been a partial failure of the consideration.   Whether in fact, to the extent of this note, he shall be made to pay for nothing. The cases cited by the counsel for the appellees, illustrative of the distinction between the *sale*, and ordinary transfer of a bill by endorsement, do not apply to this case.   It may be admitted, that in the case of the *sale* of a bill, without the endorsement of the seller, the purchaser takes the risk of its payment upon himself; but that is, where *the names to it are genuine*, and the title consequently passes to the purchaser.   But it is believed, that no case can be found where the

loss has been made to fall upon the purchaser, when *his title* to the bill purchased, has been defective. In every case of the sale of personal property, there is an implied warranty of *title*, though not of quality, and it may well be supposed, that the same principle would apply to the sale of a bill of exchange or note.

In reference to the observations and authorities, cited by the appellees' counsel to establish the distinction between bills and notes negotiated before and after having arrived at maturity, it is enough to say, that the cases in which the distinction has been recognized, were all between the holder and the previous parties to the instrument.

And it is well settled, that a holder of a bill who has become such after it has run to maturity, holds it subject to all the equities which existed against it, when in the hands of the party from whom he took it. But what have those cases to do with the present controversy? This is not an action by the holder against the drawer of the note, or against any party whose name was upon it when *Mrs. Knott* passed it to *Key.* If it were, inasmuch as it was over due when *Key* took it, there can be no doubt those previous parties might defend themselves, upon any ground which would have availed them in an action by *Mrs. Knott.*

The question here is, can *Mrs. Knott, the party who passed the note to Key,* compel him to pay the money for it, when she herself had no title, and could not, and did not transfer any to him. How can rules applicable to the holder, and the *previous* parties influence a case between the holder and the person with whom he immediately dealt? The equities of the *previous parties* can furnish no defence to *Mrs. Knott* in this proceeding of *Key* against her, though in a suit by him *against them,* they would be permitted to visit upon him the defects of her own title before she parted with the note

The remaining questions are: whether conceding that the note is to be regarded as a bill of exchange, and that *Mrs. Knott* was entitled to reasonable notice of its dishonour, she is not still so far liable as to have the amount of it deducted

from.the obligation given her by *Key*.    She passed it to *Key* on the 12th of December, 1818, and was apprised by him of its dishonour on the 18th February, 1819, two months and six days after, his letter to her of that date.    In this letter he distinctly informs her, that payment of the note has been refused, and that he holds it on her account, and expects and claims to be entitled to a credit on his single bill for its amount.    No answer is returned by her to this letter, but on the contrary she acquiesces in it, thereby admitting, and tacitly engaging to be answerable for the amount of the note. Her silence after the receipt of that letter, was tantamount to an express promise to *Key* to credit him with the $500.    It was admitting her liability for the amount.    If, therefore, *Key* had neglected to give notice in time, she would still, upon the strength of such promise, be responsible for the amount of the note.    *Byles on Bills*, 171.    16 *Law Lib*. 105.    And such would be the case even if she was under a misapprehension.of the law.    *Ib*.

It is denied, however, that paper of the description now spoken of, is subject to the rules which govern ordinary negotiable instruments.    Such notes enter into the general circulation of the country *as money*, and are treated as such by all who receive them.    It would be productive of the most serious inconvenience, if the courts were to make it necessary, that every person who receives a bank post note should present it for payment within the time required in reference to bills of exchange, under the penalty of losing his remedy against the party who passed it to him, if it should for any cause be dishonoured.

That such is not the rule is proved by the passage in *Chitty on Bills*, 421, referred to in the opening argument.

If there is any force in the argument of the appellees' counsel, that *Key* should have returned the note to *Mrs. Knott*, when he informed her of its dishonour; it is obviated by the fact, that she *acquiesced* in his keeping it, and in the steps which he proposed taking to recover the money upon it for her benefit.

The last question refers to the obligation of the appellant to have made the defence now insisted upon by him, in the action at law, and the case of *Gott & Wilson vs. Carr*, 6 *Gill and John*. 309, is referred to for the purpose of showing that such a defence might have been made at law. But is this so? The ground relied upon, is not that a *fraud* was committed by the appellees, as was the case in *Gott & Wilson vs. Carr*, and which might be taken advantage of at law, in an action upon a sealed note, but that a part of the consideration of the specialty given by *Key* to *Knott* had failed; and no rule is better settled than at law, the consideration of an instrument under seal cannot be inquired into.

But independently of this, it was impossible for *Key* to make the defence now urged in the action at law, for the simple reason, that at the time the judgment at law against him was rendered, the suit which he had instituted against the *Bank* had not been determined, and of course it could not have been known whether the money would be recovered from the *Bank* or not. The judgment against *Key* was rendered at August term, 1822, and the suit against the *Bank* was not decided until the year 1828. The county court which rendered the judgment against *Key* could not have given him a credit for the $500, the amount of the post note, when for aught then known, he might recover the same sum from the *Bank*, in which event he would have been paid twice.

Upon the whole it is submitted, that the clear justice of the case is with the appellant, and that there is no rule of law which can prevent this court from granting him the relief he prays by his bill.

TUCK, for the appellees:

This is an appeal from a decree of the chancellor. The bill was filed in *St. Mary's* county court, as a court of equity, for an injunction against an executor on a judgment against the appellant by the appellees. The equity, as stated in the bill, is, that the single bill on which the judgment was

obtained, was given for money borrowed by the said *Key* from the defendant, *Mary*, before her marriage, and that part of the consideration was a post note of the *Bank of the United States* for $500, which was protested on being presented at the *Bank* for payment, which was entirely without value to the appellant.   And that the said *Mary* had notice thereof. That he prosecuted his claim against the *Bank* on the said note, and the cause was pending at the time of filing his bill of complaint.

The answer admits that the note was given for money borrowed, and insists that the bank notes were all good and current.   They afterwards filed another answer, and the complainant took issue by general replication.   In this answer they admit the judgment, and single bill, and that it was given for borrowed money.   But they say they are ignorant if the said note for $500 was a counterfeit—nor are they aware of any objections that could be raised by the *Bank* against it.   They received it, and paid it to the complainant as good money, and they do not know that the same was a post note; they insist that the note was not returned to them by the said *Key*, or any notice of his difficulty in using it, given within reasonable time, as he ought to have done on discovering that any of them would not be taken at *Bank*, and that they are not aware of, nor bound by any steps which he may have taken to recover the amount from the *Bank*.

A bill was afterwards filed against *Francis Knott* alone, by the complainant, reciting the contents of his former bill, and praying that the defendant may be compelled to appear and testify, under a commission from *Philadelphia*, where he was prosecuting the recovery of the amount of said post note from the *Bank of the United States*.   No proceedings appear to have taken place under this bill.   On the 3d May, 1830, exceptions were filed by the complainant to the answers of the defendants.   No order appears to have been passed in relation to the exceptions—and on the 6th January, 1831, commmissions issued to take proof, which was taken, and

the proceedings afterwards, on the 7th March, 1833, transmitted to the High Court of Chancery—and from the chancellor's decree, dismissing both bills of complaint, this appeal is taken. The appellees will contend:

1. That it does not appear from the proceedings in the cause, that the said *Mary Knott* ever did pay to the said appellant, a post note of the *United States Bank;* nor that the same if passed to him, ever came to her hands by means of a forged endorsement.

2. That it does not appear that the note on which the appellant sued the *Bank,* was the same note which he had received from the said *Mary.*

3. That the appellees had not due and reasonable notice of the non-payment of the said note by the said *Bank*—and even if the prosecution of the *Bank* by the appellant, as a *bona fide* holder of said note, could affect the appellees at all, it cannot in this case, because he did not use reasonable diligence in prosecuting said claim.

4. That if the appellant ever had any defence to any part of the claim of the appellees, on said single bill, he ought to have made the same at law, in bar of the said judgment, and cannot now be relieved in equity—and the defence he now sets up, was such a one as he might have made at law.

Before noticing the points filed by the parties, it is proposed to submit a few remarks on the admissibility of the second answer filed by the defendants in the court below. The appellant contends that it ought not to be received, because it does not appear to have been filed after leave granted in the usual form. It is a familiar rule in equity, that the court will approve when done, that which they would have permitted or directed to be done. It is their object to do substantial justice between the parties, and they will not closely examine and entertain technical objections to proceedings, merely because the rules of practice have not been rigidly complied with; more especially in equity, where pleadings are less strictly and formally conducted than at law. *Lee, et al vs. Stone, et al,* 5 *Gill and John.* 19. There

45

is nothing in the record to show that the amended answer was not regularly filed—and the court will not presume that the register has filed it contrary to the practice of the court. But it is not competent for *Key* now to object that this second answer is irregularly on file, and therefore, to be disregarded by the court. The record will show that exceptions were taken to the *answers* after the second one was filed. It does not appear what order, if any, was had on them; but as they emanated from the appellant, it is not the fault of the defendants if they were abandoned by the appellants, or over-ruled by the court. Whether they shared the one fate or the other, they equally recognized the propriety with which the answer in question appeared on the file. A general replication was subsequently entered, and commissions issued to take proof at the instance of the complainant. This also precludes any objection to the answer at this time, for irregularity. At law, if there be any irregularity in conducting a cause, the opposite side must object at once—and if he takes a single step on his own part, the defect is waived. If a plea of limitations (not to the merits) be filed *after* the plea day, and issue be joined, the plaintiff cannot object that the plea came too late. 3 *Chitty's Practice,* 509, 513. *Bayley's Practice,* (288) *in the* 15*th volume Law Library.*

In equity also, the same rule obtains. "If new matter be stated by way of amendment, which ought to have been made the subject of a supplemental bill, and the defendant answer the amended bill, it is too late to object to the irregularity at the hearing." 2 *Mad. Ch.* 374, 375. "No exceptions can be regularly taken to an answer after replication put in, for by the replication it is admitted sufficient; yet in some cases, the court has ordered the replication to be taken off the file, and suffered exceptions to be put in." 1 *Har. Ch. Pr.* 320. From these rules at law and equity, it may be asserted, that the objection by the complainant to the second answer, is too late. The irregularity, if any, in its reception by the clerk, is waived, by the filing of exceptions, and a replication. At the proper time, before any step on his own part, he ought to

have entered a motion, " *ne recipiatur*," when alone the court could have rejected it.

But it is submitted, that the rejection of the answer in question, cannot avail the appellant, because the first answer, however defective or irresponsive it may be, puts in issue the allegations in the bill, and the complainant must sustain them by proof. If defective, the complainant might have excepted, and if sustained in his exceptions, the court would have ordered an answer over. Upon the authorities above mentioned, the replication admits the sufficiency of the answer, and the bill must be proved as fully, as if all its statements were denied. *Joice and wife vs. Taylor*, 6 *Gill and John.* 58, 59.

The points filed by the appellees, and upon which the merits of the case are presented, are little more than denials of the propositions stated in those of the appellant. The appellees contend that the chancellor's decree ought to be affirmed. 1st. Because it does not appear, that *Mary Knott* ever did pass a post note to the appellant—or, that the same, if passed to him, came to her hands by a forged endorsement. In other words, the title of *Mary Knott* to the said note, is not disproved, so as to deprive her of the power of assigning it to the appellant. This point may be considered with the 2d, because, it does not appear that the note sued on in *Philadelphia* by the appellant, was the same one that he received from the said *Mary Knott*.

The appellant to recover, must establish the facts controverted in these points. There is no admission in the answer of the identity of the note—indeed, the defendants disclaim any knowledge whether they ever gave *Key* a *post note*. They do not know whether it was a post note or a bank note, or whether any endorsement thereon was forged. The testimony is altogether hearsay—derived from the officers of the *Bank*—that a note *which Broome presented for payment* was stolen from the mail, and afterwards put in circulation with a forged endorsement. The loan was made to *Key* by the appellee, *Mary Knott*, on the 12th December, 1818. On the 14th September, 1819, *Broome* received *a post note* from *Key*

for collection. This is all the testimony from which the court are asked to infer that *Key* received this *post note* from the defendant, and that he sent the *same* note to *Broome.*

3d POINT.—There is no evidence that the defendants had reasonable notice of the dishonour of the note, or acquiesced in the steps taken by the appellant to recover its amount, substantially admitting that they had any interest in the "suit in *Philadelphia.*" There is no proof of any demand on the *Bank* for payment of the note until after September, 1819. The allegation of *Key,* that he passed the note to *Armstrong,* who sent it to the *Bank* is not sufficient proof of a demand. Why was not *Armstrong* examined to prove the time and circumstances of the demand? And if the demand was not made until after *Broome* received the note, we submit that a presentation after nine months is not within reasonable time. The letter from *Blackstone,* contained in *Broome's* testimony, is no evidence against the appellees, even if such a letter was written—and the hand-writing of *Blackstone* is not proved—because his authority as attorney in this case, did not extend to any control over the case of *Key vs.* the *Bank,* in which he was not counsel. It does not appear from the testimony of *Blackstone,* that he was specially authorized to write such a letter, and in the absence of proof we must suppose that it was done without authority. But the letter of *Blackstone* proves too much. It proves the genuineness of the note, because it contains *Key's* own admissions that the *Bank* acknowledged that the note was a good one. If the note was good there could have been no forgery in its inception or endorsement, and therefore the *Bank* was bound to pay it. In that case he could have made no defence to the action at law of the appellees against him—because he had not received a spurious note—and if the note was good, as the *Bank* admitted, his suit could not have failed against the *Bank* under ordinary diligence in conducting it. The letter being introduced by the appellant's witness, must be taken altogether, or entirely rejected. But it is insisted on our part that no notice of the dishonour of the note could have fixed

on the appellees any liability to pay it.    This was a post note, payable to *order* and regularly endorsed by the payee, and transferred to *Key* by delivery only, after it had become due.    It is not a bank note, but on its face purports to be a bill of exchange, though *sui generis*.    The court will recollect that these notes were put in circulation by the *Bank* with great diffidence of their right under the charter to do so.    If they had been or ever were considered as bank paper, there could have been no difficulty in issuing them.    Though they were intended to supply the place of bank notes to some extent, and perform the office of *currency*, yet the nature and character of them is not changed, and they must be regarded as other bills, and treated in all respects as negotiable paper, and not as money.    If the note had been endorsed by *Mrs. Knott* she would have been entitled to the same notice that the law allows to endorsers in all cases.    A delay beyond the first mail is not considered reasonable notice to an endorser; but in this case, upon *Key's* own shewing, she had no notice until some time in February, after he had received the note from her, and when, perhaps she had by his delay, lost all opportunity of recovering the amount from her assignor.    There is no allegation or proof that she knew at the time of the delivery, that the note was of no value, and the court must presume the transaction to have been *bona fide*. A distinction is made in the books between a transfer by delivery *in payment* of a pre-existing debt—and such a transfer (as in the present case) in exchange for goods, money, or other bills or securities.    In the former case, if the bills turn out of no value, the transferrer is liable on the consideration of the debt, and not on the instrument, *unless the transferrer has made the note his own by laches*.    In the latter cases, the transaction is held to be a sale of the bill by the transferrer, and the purchaser takes it with all risks.    Upon this principle, if a party discounts bills, and receives in part other bills, not endorsed, and they turn out to be bad, the party making the transfer is discharged.    Taking them without endorsement, he takes the risk on himself.    In this case *Knott*

took *Key's* sealed note, on interest, instead of deducting discount, and passed this bill on the *Bank* in part of the amount. There is no real difference in the cases. *Fydell vs. Clark,* 1 *Esp.* 446. *Bank of England vs. Newman,* 1 *Ld. Ray.* 442. *Emly vs. Lye,* 15 *East.* 7. *Fenn vs. Harrison,* 3 *T. R.* 759. *Ex parte Shuttleworth,* 3 *Vez.* 368. *Ward vs. Evans,* 2 *Ld. Ray.* 928.

There is also a material distinction between a transfer made *before* a bill is due, and one made *after* that time. In the first case, the transfer carries no suspicion on the face of it, and the assignee receives it on its own intrinsic merit— nor is he bound to inquire into any circumstances existing between the assignor and any of the previous parties to the bill. See 3 *Tem. Rep.* 82. But when it is made after it becomes due, whether by endorsement or mere delivery, it is settled that at least it may be left to the jury, in cases at law, upon the slightest circumstance, to presume that the assignee was acquainted with, or had notice of the circumstances which could have affected the validity of the bill. 3 *Term Rep.* 80. *Camp.* 19. *Johnson vs. Bloodgood,* 2 *Caine's Cases in Error,* 303. The cases upon these points are collected in *Byles on Bills,* 16 *vol. Law Library, pages* 91 *to* 97.

But conceding that reasonable notice would make the defendants liable, is there any proof of such notice as, under all the circumstances, they ought to have received? Further, must not the notice in such cases be accompanied by the note itself? *Key* says he informed *Mrs. Knott* in February, 1819, of the non-payment of the note. Of what avail was it to her to be informed of this fact, unless she had also at the same time the note itself to present, and return to the person from whom she received it. It is not necessary to return a note to an endorser when notice of dishonour is given, because the property is in the holder, and the design of notice is to afford the endorser an opportunity of securing his funds in the hands of the person on whom the bill is drawn, and the possession of the bill is not necessary to this object. But in the case at bar, *Mrs. Knott* could not have claimed the amount of the

Key *vs.* Knott and Wife.—1837.

note from her transferer, unless she went prepared to place him in the same situation, by the possession of the note, that he was in at the time she received it; and this she could not do, because *Key,* instead of returning the note, undertakes the collection of it, by sending it to *Philadelphia.* But *Mr. Key* has not used diligence in prosecuting the claim in *Philadelphia,* even supposing that the defendants can be affected by his acts in that respect. The note was not sent on until September, 1819, and the suit was not commenced until 1822, and not decided until 1828; and as he himself states in the bill, the delay was caused in part by his not being able to procure counsel on terms that he thought reasonable. If he chose to assume the responsibility of acting for *Mrs. Knott,* he should have prosecuted carefully and diligently, and he cannot now avail himself of his own neglect. Upon this last point then, we contend, that *Key* should have given notice within a shorter time, accompanied by the note itself; and having failed in this, and assuming on himself the duty of commencing suit without the knowledge or consent of the defendants, he must abide the consequences. It is said by the appellant's counsel, that he informed *Mrs. Knott* that he had delivere the note to *Armstrong,* and if she had intended to resist his defence to the single bill, she should have given him notice of that design, that he might have recovered the note from *Armstrong* and tendered it to her. It surely was no part of her duty to give him any such notice, because, as before said, it was his own fault that he was in a situation to need it. He had no business to retain possession of the note after its dishonour, if he intended to claim the amount from her. His duty was to have returned the note immediately; by keeping it as long as he did, and attempting to collect it, he has made it his own, and cannot now complain of his own *laches.* *Ward vs. Evans* 2 *Ld. Raymond,* 928, 930. There is no evidence that *Key* ever considered the note valueless, until he sent it to *Broome* in September, 1819; and then he did not give any notice thereof to *Mrs. Knott.* In his letter to *Mrs. Knott,* February, 1819, he puts his objection on the ground that the

endorsement could not be deciphered, and expressly asserts that the bank did not protest the note as void, and this accords with *Blackstone's* statement of *Key's* admission to him. Now if the illegible character of the endorsement was the only ground of objection, *Key* either knew the fact when he took the note, or the names were effaced while in his possession. In either event he cannot charge *Mrs. Knott.* All the facts and circumstances of the case, bring it within the principle of those authorities, which declare that a transferee by *laches* may make a note his own, as stated in *Byles on Bills,* referred to above. The proper test is, whether the chances of *Mrs. Knott's* recovering the amount from her transferer have been prejudiced, by the failure of *Key* to return the note? If so, he must bear the loss. In point of fact, the note never has been in her possession since December, 1818.

4th POINT.—That if the appellant ever had any defence to the action at law on the single bill, he ought to have made the same in the county court, and cannot be relieved here, because the defence now set up, if sustainable at all, might have been presented in the county court. It is competent for a court of law to inquire into the consideration of a sealed instrument. Where fraud is suggested, or any other defence made, under the plea of *non est factum,* in bar of the action, the court are authorized to grant relief. This is the law of England and of this country, independently of decisions in the States. But this court have settled the principle in *Gott and Wilson vs. Carr,* 6 *Gill and John.* 309.

The points relied upon are not contrary to the act of 1832, nor is it necessary to disregard the provisions of that act to sustain them.

STEPHEN, Judge, delivered the opinion of the court:

We think that the decree in this case is erroneous, and ought to be reversed. The complainant against whom the judgment was obtained at law, not being able to make his defence before that tribunal, was clearly warranted in appealing to the remedial powers of a court of equity for that relief,

which he could not obtain in a court of common law jurisdiction. The action in which the judgment was rendered, was instituted upon a single bill, and the principle is uncontrovertible, that the failure of consideration upon which the defence was founded, could not have been inquired into, or proved, upon the trial of the case in a court of law. The single bill which constituted the cause of action, was given for the repayment of a sum of money loaned by the plaintiff to the defendant in that suit; there was no allegation of fraud or illegality in the transaction, but a part of the money which formed the consideration of the single bill was a post-note of the Bank of the United States, to which the plaintiff had no title at the time it was loaned to the defendant, it having been stolen out of the mail, and put into circulation by a forged endorsement of the name of the true owner. Upon being satisfied of these facts, the bank paid the amount of the note to the parties who were the legal holders at the time the theft was committed, and of course refused to pay it a second time, upon presentation by the party into whose hands it had passed since the forged endorsement. These facts are proved by the testimony of *James M. Broome, Esq.* to whom the note was transmitted by the appellant, for the purpose of instituting suit against the Bank of the United States for its recovery, after the payment of it had been refused by that institution.

Under the provisions of the act of 1832, the whole of *Mr. Broome's* testimony is admissible, no exceptions being taken to it in the court below; therefore the objection that a part of it is hearsay, derived from the officers of the bank, cannot now be raised.

That the holder of negotiable paper, whose name is forged in the endorsation of it, does not thereby lose his right to the money, and that no title can be made through the medium of such a forgery, is a proposition too well established to admit of controversy. If for such a principle authority be necessary, it may be found in *4th Term Rep.* 32, where *Mr. Justice Grose*, after stating that no person but the payee, or the person authorized by him, can demand payment of a bill

of exchange payable to order, says, " if this decision will prove a clog on the circulation of bills of exchange, I think it will be less detrimental to the public, than permitting persons to recover through the medium of a forgery." To the same effect see *Byles on Bills of Exchange*, 113, where he says, " if the acceptor or maker pay one who derives his title through a forgery, that will not discharge him." In 13 *Wendell Rep.* 101, it is said, "that payment in the bills of an insolvent bank is not a satisfaction of a debt, although at the time and place of payment the bills are in full credit, and the parties to the transaction are wholly ignorant of such insolvency. If previous to such payment the bank has in fact become insolvent, the money must be lost in the hands of him who held it when the bank failed." For the same principle see 2 *John. Rep.* 455, where the court say, that a counterfeit or forged note of a bank, is no payment for goods sold and delivered, although both parties were equally ignorant of the forgery at the time the payment was made. The note paid away in this case, which proved to be a counterfeit, was a note of fifty dollars, purporting to be a note of the Boston Branch Bank of the United States.

The appellant, therefore, was clearly entitled to a credit upon his single bill for the note of five hundred dollars, unless he has forfeited his right to such credit, or made the loss his own, by some act or *laches* on his part, which would operate as a bar to such claim. It appears by the proof in the cause, that the appellant on receiving this note from the appellee, immediately paid it away in the course of his dealings, with two persons of the name of *Armstrong*, by whom it was returned to him, on payment being refused by the bank. The single bill which was given for the money loaned, was executed on the 12th of December, 1818, and it appears by a letter of the appellant, filed as testimony by the appellees, that notice was given to the lender on the 18th of February, 1818, that the note had been presented at bank for payment, and that the bank had refused to pay. In this letter, the lender of the money is informed, that the appellant claimed a credit

for the note, not considering it to be his loss, and his services are tendered to her to endeavour to get the money from the bank, as her agent. To this letter it does not appear that any answer was returned, but the silence of the party to whom it was written may, we think, be fairly construed as a tacit acquiescence in the proposition therein contained. *Qui tacet consentire videtur; qui potest et debet vetere, jubet.* In support of this principle see 4 *Dallas*, 134, where the court, in speaking of letters of credit, say, it is not necessary that they should be answered if credit is given upon them; like the case of transmitting a bond in a letter, acquiescence and acceptance are implied in the silent receipt of the instrument. Not only is there proof of acquiescence and assent by her silence, but it appears by a letter written by her counsel at a subsequent period, that she recognized the complainant as her agent in the steps taken by him to recover the money from the bank. The letter here alluded to, was the one written by *Thomas Blackstone* to *James M. Broome,* whom the appellant had employed to institute a suit against the Bank of the United States, for the recovery of the money claimed to be due upon the note. In that letter, it appears, that she considered the suit as instituted for her benefit. *Blackstone* states himself to be counsel of the person who loaned the note in question to *Key,* the appellant, and asks of *Broome* to be informed of the state of the suit, and all the circumstances relative to it, as soon as he could make it convenient. If this suit was not instituted with the consent and approbation of the appellee, if she felt no interest in the prosecution or termination of it, if she intended to hold *Key* responsible, no matter what the issue of it might be, and intended to rely solely upon her bond as the evidence of her claim, it is difficult to conceive a motive which could have prompted such an inquiry. This letter, too, was written shortly after the recovery of the judgment at law, and pending the suit in equity for an injunction and relief against it; and affords a pretty strong commentary upon the state and conviction of her own mind, as to the justice and equity of the complainant's pretensions in that suit.

No objection being taken to the admissibility of this letter, as evidence in the court below, it is too late to except to its legality as testimony in this court. The note in this case being a bank note, which is a common medium of exchange, and circulates from hand to hand as money, the rules as to demand and notice applicable to bills of exchange and promissory notes, do not, we think, apply. The establishment of such a principle would go far to impede, if not to destroy their circulation as a common currency, and would be productive of great inconvenience to the public generally, and to the mercantile community in particular; the objection, therefore, founded upon the want of timely notice of dishonour, is not we think sustained.

In cases of this description, the jurisdiction of a court of Chancery is two-fold, and embraces the powers of both court and jury, and even where the testimony is conflicting and contradictory, a resort to a court of law for the decision of a jury, rests in sound discretion, and is not necessary if the conscience of the chancellor can be satisfied without it. If authority be deemed necessary for so plain a principle, it may be found in 1 *Hen. and Munford,* 91 *and* 372. Upon the whole, we think that the suit against the bank, having terminated unfavourably to the plaintiff, the complainant in the court below was entitled to equitable relief against the judgment at law, obtained against him in *St. Mary's* county court, so far as the same embraced a recovery of the plaintiff's claim for the post note of $500 loaned by the plaintiff to the defendant, and that he ought to be credited with the amount of that note, and interest thereon from the time he was chargeable with interest for the money loaned, according to the terms of his obligation to the appellee; and as he was forced into equity to obtain relief against the judgment at law recovered against him, in justice he is also entitled to his costs incurred in the court of Chancery. Upon these principles we think that the rights of the parties will be equitably adjusted, and this court will sign a decree accordingly.

DECREE REVERSED.